Case number 231285, Eric Brown et al. v. City of Wyoming, MI et al. Argument not to accept, if the minister decides. Good morning, your honors. Christopher Desmond on behalf of the plaintiffs, Eric Brown, Roy Thorne, and Mr. Thorne's son, S.T., who is a minor. Judge Gibbons, I'd like to reserve three minutes for rebuttal. Okay, thank you. If possible, and I know I need to keep track of that myself. Also, I'd like to- Well, we have a helpful line. We do, yeah, yeah. I'd like to thank the Middle District of Tennessee. This is fantastic. This is a truly beautiful court, so it's really an honor to be able to be here today. Your honors, I'm happy to answer any questions that the panel has regarding this. Unless the panel does have any questions, I think I'd like to start with the issue of unlawful detention to begin with. And so, with the unlawful detention, the focus, obviously, is always on the issue of probable cause, and whether the officers involved had probable cause to believe that a criminal offense had occurred. And so, here, the authority that we've relied on that I think really is applicable is the Garden-Hyre opinion. And what the Garden-Hyre case talks about from this court, it talks about the idea that when an officer is making a probable cause determination, they're not free to just exclude any exculpatory evidence that they're aware of or ignore that exculpatory evidence. Instead, they have to consider all factors that are presented in front of them. And here, this is where Logan Weber, defendant Weber, really stands out, I think, from everybody else. Because what we have, obviously, is a situation, and I won't do a full recitation of the facts. I know the court is aware of them. But what we have is a situation where approximately one week prior to these offense, Officer Weber responded to this same home on Sharon Avenue because there were reports of someone possibly trespassing. Now, this is obviously a home that was listed for sale. It had a real estate sign outside. When Officer Weber responded that day, he didn't indeed find a man inside of that home. It was a black male inside of the home. And he was not scheduled to be there. Officer Weber that day, in a distinction from what he did on the day involved in our case, Officer Weber directly contacted the homeowner and spoke with the homeowner. And the homeowner informed him that, yes, my home is listed for sale, but there's no scheduled viewing today. Nobody is supposed to be there. And so when Weber shows up at the home, he finds that the doors are locked. This individual entered through a home, an entrance that was inadvertently left unlocked. He peacefully exited the home. There were no weapons involved. Officer Weber didn't feel the need to point any firearms at him in making the brief detention that occurred outside that home, and that individual left. Now, importantly, that individual was driving a black Mercedes-Benz. But he didn't leave, did he? Wasn't he arrested? Well, he was briefly, yes. He was taken into custody. He was charged with a misdemeanor trespass offense. And I don't think we've ever quite figured out what that individual's intents were that day. He stated that he saw the home was up for sale and that he wanted to take a look through it. So the day in question, though, regarding my clients, when Officer Weber receives this call saying that the same man who was at the home the week prior is back at this house. Now, this call is not coming from the homeowner. This is coming from a neighbor. The initial tip-off came from a neighbor, too, right? The one about the other fellow. The prior week, I believe it did, but in that prior interaction, Officer Weber, even though it came from a neighbor, did end up speaking with the homeowner to find out should this person be in your home. In our scenario, he didn't make that phone call. He never spoke to the homeowner this time. He only spoke to the neighbor who said that it's the same man who was here last week. And so cars are dispatched to this home. Devin Quintard arrives first, and he immediately pulls his weapon. He's got his gun pointed toward the home, and I think he's taking cover while he's waiting for others to arrive. And when Officer Weber arrives, what he states, and I think, frankly, this is a matter of credibility for a jury, but what he states is, I didn't see the precise make and model of the car that was there that day. It was a black sedan that was similar in make to the one that had been there previously. Well, the week before, it was a black Mercedes. This time, it's a black Hyundai Genesis. Oh, okay, but Hyundai owns Genesis, but a Toyota is to a Lexus as a Hyundai is to a Genesis. Oh, certainly. So it's a black luxury vehicle. Certainly, Your Honor. I'm not taking away from the fact that it's a nice vehicle.  In other words, when you say it's a Hyundai, it seems like it should be more distinguishable. Yeah. It's a black luxury city. Right, and I don't mean to discredit Hyundai in any way. It could have been a black BMW. Oh, I have nothing to take for Hyundai. But what I mean is, the car could have been a black BMW. It could have been a black Jaguar. It doesn't matter. To me, when you have a vehicle there, it's no different than a fingerprint, quite frankly. Just because they may appear to be the same, we have an ability to tell if they are the same or not, and frankly, with vehicles, it's particularly easy. There's a license plate and a VIN number, and you can run it, and you can find out. Officer Weaver chose not to do that. Instead, they surrounded this home with weapons, pointing weapons inside the home at my clients. Do you distinguish between Weaver's conduct and that of the other officers on the scene? I'm sorry. I missed the beginning of that question. I said to you. Sorry. That's okay. Do you distinguish between the conduct of Weaver and the other officers on the scene? I do a little bit, yeah. I think that Weaver stands in a different position than the other officers because of their previous knowledge. I think where Weaver- Do you get more relief if you have all the officers in this case? If you just have Weaver alone to go to trial, does that affect your recovery in any way? No, I don't think it does. As long as you prove Weaver should have gone to trial, it sounds like you've got a case here. Yeah, our world of damages is what it is. Let's focus on these other officers. Yeah. What do you have in the other officers, why they should be going to trial? Their use of the firearm. I think the best thing that highlights what the other officers did wrong is probably the testimony from Officer Kamstra, I believe. It's Russell Kamstra. And I think this is around page 48 of his deposition, although it occurs several times in his deposition. He's asked, why didn't you pull your gun? You had other officers there who were seeing the same thing you were seeing and they had weapons drawn. Why didn't you have your weapon drawn? And he said, well, they were being compliant with us. I didn't see any indication that they were armed and I never felt threatened by them in any way whatsoever. And so that really is the standard that comes from this court and comes from Tennessee v. Garner about when we can use force and when we can't. Isn't it your position that guns should never have been pointed at all during any of these events? It is, Your Honor, yeah. Even before the people came out of the home? Correct. Even before they came out of the home. Even before the officer, I can't remember, the one who was first to get there, before he had any backup. Yes, I'd say even before he had backup. I'd point to a couple places in support of that. Do you really need to argue that here? That seems pretty extreme to me. I don't know if I do need to argue that, Your Honor, but I am arguing and I certainly am because if you look at my clients and you look at their depositions, I mean, we have a minor child who's inside the home and he's simply... But the officers don't know that when they arrive at the scene, do they? That there's a minor inside the home? No, they don't. So why should that factor into whether or not they should have drawn their guns? Well, because I think it speaks to the idea that we see in both the Vanderhoof case and the Binet case that I've cited to this court about the seriousness of pointing a weapon at somebody. I guess for me, I mean, the closeness comes as far as drawing the gun or having the gun pointed. I don't think drawing the gun... There's a drawing the gun, taking it out of the holster, and then there's the actual pointing. Sure. Are you saying they shouldn't have even taken it out of the holster? Well, I do see a distinction in that, Your Honor. I'll say, you know, my law enforcement officer, or expert, Ken Katsaris, what he would say on this point generally is that you don't draw a gun unless you're preparing to use a gun as law enforcement. But I do understand the point that you're making. Now here, the fact that... Okay, I guess for me, I just want to tell you my position on it. It seems like to me that the problem comes, or potential problem, is once the people are coming out of the house, and you have, I think it's Jackson who's pointing at them. That's right. Whether he should have pulled his gun down at some point, for me, personally, that seems to be the real rub for the gun issue. Yeah. And I guess what I'm trying to figure out is, I guess you're just saying the whole encounter, he should have never had the gun up. But I mean, if I'm not comfortable with that position, then is there some other point where he should have put the gun down? I think the point that you've highlighted is a particularly important moment when Officer Jackson trains the gun on them as they exit the house. I'd point out, that's a particularly important moment for two different officers here. Both for Officer Jackson... And also, I mean, isn't the standard, like, it's excessive force, right? Mm-hmm. So how can it be excessive force if you're pointing a gun at a house before anyone has even come out of the house? There's not even any evidence that they... Is there any evidence that they even knew guns were drawn? Oh, there certainly is. They knew that guns were drawn before they came out of the house? Yes, certainly, Your Honor. There's testimony in here that Officer Quintard, I believe, or it might have been Kotarek, it was either Eric Kotarek or Devin Quintard, pointed a gun at an upstairs window, which caused my clients to duck when that gun got pointed up toward them, which indicates that they perceived the gun. Now, I'll say, whichever officer that was denied that he pointed the gun at them, but that's a credibility dispute. Counsel, can we talk about qualified immunity? Because it seems to me that you're just talking about whether there's a constitutional right. And, you know, ultimately, we can't get relief unless the right is clearly established. So in both the Fourth Amendment and the Eighth Amendment, excessive force and unlawful detention, the Supreme Court has told us, you better have a case that is really, really, really similar. Yes. I mean, that's Westby, which also is an unlawful entry. So what are your best cases? So I think for the Fourth Amendment violation, our best cases are Bonnet and Vanderhoof. There's also a U.S. Supreme Court case that we cite too that talks about this idea that when you're pointing a firearm at somebody and you're making demands of that individual, you're certainly implying that there is a threat of force that stands behind those demands. Yes, but in Bonnet, the officers brandished their weapons, entered the apartment, forced the Bonnets to the floor where they handcuffed them, interrogated them for nearly an hour during the whole time officers were handcuffed and held at gunpoint. That just doesn't sound like what happened here. No, you're right when you're looking at the totality of everything that was done in Bonnet. But I don't think the language in Bonnet when they talk about the pointing the gun at someone, I don't think that there's language in there that indicates you also need all of those other things present. But what I think is better for us than Bonnet on that particular point is Vanderhoof because there's a line from Vanderhoof that we quote in our brief where they say, I think this was Vanderhoof, where they say, yeah, the person that you've trained a firearm at may not have been physically injured, but the officer who did that certainly laid the building blocks for a 1983 cause of action. And in that case, it wasn't like Bonnet where they had people on the floor and they had raided a home. This was an officer who was off duty late at night who got into an interaction with members of the public out on the street. And that's what this court said. And that was in 2019, two years before the events in this case. Finish your sentence and you have your time to rebut. Okay, I apologize, Your Honor. I would just like to say, Your Honor, that's what Judge Jarboe primarily relied on is that it was not clearly established and that we use general case law. I'd suggest that Bonnet and Vanderhoof are sufficiently specific. Thank you, Your Honors. Good morning, Your Honors. May it please the court, Marcy Stepanski on behalf of the defendants at police in this case. I would submit that the prior action is completely dissimilar from the answer that happened here and it led to the probable cause that we have. The prior incident involved a trespass. Officer Weiber verified that no one was supposed to be in the house at that time. So when he gets a subsequent call that the same person is back with two additional people, now we know that the person who was there before knows he's not supposed to be there. And so the information they have is he's back and he's brought two others with him. That elevates the call to a break again entering, which is a felony. So, Officer Quintero arrives first. Officer Weiber pulls up, but the mail-a-boo is between the Genesis and Officer Weiber's vehicle. So he sees a black vehicle, kind of the same model, body style, but can't distinguish for sure if it's a Mercedes or not. At this point... Do the other officers besides Weiber know about it being a Mercedes for the earlier... No, I don't think there's any indication... Why was he the only one who has all the details? Because he was on that initial call. He was the only one on that initial call. And I believe Officer Champion came after on that, or Chapman came after that one.  So, in any event, so this was something that happened very quickly. It only lasted a few minutes. As soon as he... Is that a part of the problem, at least as to Weiber? Because he could have immediately, when they came out of the house, brought to the attention of the others that this was not the same individual who had previously been in the house. And so... Yeah, so he sees... They want to get everybody, get the scene secured and get everybody out of the house. And then they secured the three individuals in handcuffs. He immediately sees that one of these three individuals was not the gentleman that was there. He would have seen that when they exited the house. When they exited, correct, Your Honor. Not after they've handcuffed him and gone through some other stuff. Sure, I misspoke, yeah. You're right, Your Honor. So he... But he does share that information. And at the same time, he is also learning why, you know, around the same time as when Brown also says, listen, I don't know what's going on. I'm a real estate agent. I'm authorized to be here. But prior to that, Weiber did call. It's not just that they got this information through dispatch. He did call and speak to the caller, the person who called in. The homeowner. The neighbor. The neighbor, to verify the information that she provided. And she said it's the same person with two additional people. Excuse me. No, I was going to say, how much time do you think elapsed between the time that he recognized this is not the same guy and the time that he was released from handcuffs? It seems like it was about two minutes or less. And so that brings us sort of to the clearly established part. Like how quickly do you have to release someone if you... And what Judge Jarboe said down below is, look, they got this call that elevated it to a B&E. They wanted to... They're there. They want to make sure that the people that are there are supposed to be there. So as soon as they did that, they released everyone from handcuffs. They apologized. They explained it was a misunderstanding, which is exactly what qualified immunity is supposed to protect. Mistakes in fact. Were the individuals patted down before they were handcuffed? Not that I recall, Your Honor. I believe that they just immediately wanted to secure them so they could figure out what was going on and secure the scene. So there's nothing in the record they were patted down at all? Not that I'm aware of. I don't recall. I don't recall that, Your Honor. I believe they had them back up out of the front door and they put them in handcuffs. And I remember you had a questionnaire about Officer Jackson. He only had his gun trained for as long as it took to just handcuff the suspects. And what's in the record about the reasons why they were handcuffed? I think because there were three individuals. There was a call of the breaking and entering ahead of time. And they wanted to secure the scene and make sure nobody else was in there, make sure nobody else was going to pose a threat or a danger to them. Is there anything in the record about that being standard procedure for police officers to do this? To handcuff individuals without patting them down and to secure a scene? Well, I think when you have a felony, we put it to be a felony in progress. I think that is pretty standard throughout many circuits is that if you have a B&E and you feel like there could be someone with a weapon, that you certainly would want to secure them before you take any further action. It just seems like it would have been less intrusive to pat them down rather than put them in handcuffs. Sure, and I understand that. Matt, I feel the same way when looking at it in hindsight. But what happened from the get-go, at least Officer Weiber was aware that there existed perfectly lawful reasons that several people might be at that house at one time, correct? Correct. It was reported that there were three. As soon as they exited the house, he knew that the neighbor's report was incorrect, correct? Isn't that right? Well, he knew that the same person wasn't there, but he still didn't know who these people were and what they were doing there. But he knew that her report, that it was the same person, was incorrect. That's correct, Your Honor. And he could have known, had he chosen to look, that the car was not a Mercedes. Right, but this is all happening very quickly. I mean, they're not focusing on the car at this moment. They're focusing on the house, the reported felony being in progress, and then, you know, getting everyone secured. And then once they did that, this was literally like two minutes that they let everybody go and apologize. Do you think probable cause dissipated the minute that Officer Weiber, I think is his name, realized that the person, that none of the three individuals were the same person he had arrested last week? Well, I think it certainly, you know, Judge Jarboe recognized that we can sort of bet that this officer still don't know what's going on, right? They got this call of someone that was not supposed to be in the house. They go there, they want to secure the people, verify that they're able to be in the house. And the guy that they did lawfully arrest the time before, he also said, oh, I'm here to see the house. They did, that's correct. That's exactly correct. And so they wanted to ensure that they had authority to be there. You have to understand this is happening very quickly. Also, the earlier encounter, he did not put the guy in handcuffs, correct? No, he was waiting for backup actually, for officer, I think it was Chapman, to arrive when the man exited the home on his own, on his own volition, sat down on the porch. So he wasn't going to do, going to take any action until he had backup on that prior occasion. So in terms of looking at the totality of the circumstances, how quickly everything developed, the entire incident lasted, I think, less than, from the time of dispatch to the time they were released, less than 15 minutes, I believe. I thought you said it was about two minutes. What's the two minutes? I'm just saying from the time that, the entire incident happened so quickly and unfolded so quickly, the time that the call came in, the officers arrived, surrounded the house, got the individuals out of the house, secured them, and then released them. And that's what, Judge Giddens was asking, what's the two minutes about? Oh, that was, the two minutes was, it was less than two minutes from the time that he would have realized that it's not the same person from the week before and they were released from handcuffs. It was very quickly. How do we know that? I think it's, I think it's a cross between the video evidence and the testimony because there's a timeline that was created. I knew, he knew that, that none of them were the individual from before. He knew that before they were placed into handcuffs. He did, but he still didn't know what they were doing there and they did have this call for a trespass. He knew it wasn't the same individual, but he still didn't know that it wasn't a trespass, right? And so, did he know that that same individual was not still in the house? No, and that's the other part of it. I mean, it was reported that there were three individuals, but they didn't know that when they, they don't know that for sure until they were able to secure the scene and they,  have to be careful. We just had three officers serving a warrant who were shot and killed.  you just, it's, I mean, I don't know that there's any prior case law that says that they couldn't have drawn their weapons for safety reasons under these circumstances.  Binet and Vanderhoef are so far afield from this case. Binet, the officers had on masks, they had them on the floor for an hour and they were they were pointing guns at their heads the whole time. And then Vanderhoef, the officer was off duty, not in uniform. It was an accident involving some scared teenagers. You know, it's just, those cases cannot guide the outcome in this case for purposes of qualified immunity. And, I'm trying to see, I can't see. Well, isn't it accurate to describe Officer Weiber's conduct as failing to failing to relate exculpatory evidence promptly to his police colleagues? Well, I guess it's a question of what, you know, what the prior case law says would qualify as prompt because he's processing this at the same time, like, hey, wait a minute, we got this call, I verified, this is not him. Okay, let's secure the scene, make sure nobody else is inside and then, you know, then they find out that they were lawfully on the premises and released him right away. So, he's processing it in real time whereas we're looking back at this in hindsight with benefit of knowledge that he didn't have at the time. But he never disclosed that. I mean, there was not a point in time at which he said, you know, this is not the same guy, right? That's true, but they were released so quickly after he made that recognition. They were released within two minutes of that. So, it's a situation where, you know, they're verifying everything, they're securing the scene and then, Brown volunteers, I'm a realtor, I'm authorized to be here and they immediately verify that and then let him go. But they don't know it. It seems like, it seems like the gist of this argument is, this was sort of de minimis in hindsight and therefore, everything the officers did is fine and there's qualified immunity. I don't think it's necessarily, I mean, it certainly could be de minimis. I mean, no one wants to undervalue the fear of, you know, the younger person he had in this situation especially, right? I mean, everybody feels badly about that.  but in terms of how, you know, whether it's de minimis, I think it's beyond that. It's just, it's a situation where there was probable cause and it didn't, it didn't extinguish in the moment that he recognized, he didn't recognize last week's gentleman in this group of three because he still had to verify what, you know, why were they here? We got a call of a trespasser breaking and entering. Just because this person wasn't there doesn't mean that it wasn't. The week before, he said that he was interested in looking at the house too. So as soon as they verified that, they were on their way. So, I think he would have, you know, he would have been remiss in not verifying that and then just saying, oh, you're not the same guy, let's go everybody. And then once they were on the house breaking and entering, then we'd be, you know, potentially a different lawsuit then.  is there any testimony in the record that suggests that the officers were in fear for their own safety? Because they drew the weapons and, you know, we normally don't think you do that just show up at a crime scene. Yeah, I think that because Quintard arrived by himself initially and it was a breaking and entering call and that there were three suspects involved. You know, it's, it's a situation where it's certainly a judgment call and he's, you know, by himself and they're trying to secure the scene and wait for backup to come. So at that point, you just unholster his weapon. He could have sat in his police car waiting for backup without pulling his weapon, right? I'm sorry, your honor? He could just have remained where he was waiting for backup without taking any aggressive action. Well, I think you want to kind of take a defensive position just for safety reasons. You know, exit the vehicle and I think he was behind his door or something like that. So, you know, this, this is, I think what's happening in, you know, this case is it's easy to look backwards and say, well, this could have gone differently. Maybe they could have handled this differently. But with the information that they possess at the time and processing this in real time, this is just along the lines of our Supreme Court mandate that says, don't look at it with 20-20 hindsight. Look at it with the information the officers possessed at the time and from their perspective on the scene and what was appropriate and what was precluded by established law or not. And there are a fair number of cases that talk about speed with which officers have to make decisions.  Smith v. Freeland is one from this court. There's supposed to be deference given to them. And when you look at this in total and the amount of time that elapsed between the handcuffing and the release, I mean, there's no case law that would foreshadow that that was  clearly prohibited to verify that they were lawfully on the premises at that point. Unless there are any other questions, I'd be happy to  Thank you, Your Honors. Thank you, Your Honors. Again, Christopher Desmond on behalf of the plaintiffs. Judge Bush, probable cause absolutely disappears the moment that they exit out onto that porch. That was a question you had asked earlier. The second they walk out onto that porch and Officer Weber or Weiber sees my client and acknowledges in his deposition these are not the same people. There is no probable cause at all anymore to detain my clients or to allow Officer Jackson to point a gun at them. I can understand that argument for Weber, but I don't understand it for the other officers. Oh, sure, sure. Yeah, and that's fine,  I understand that. I understand the other officers who don't have that same information. It seems like the other officers, I mean, when you're doing the probable cause determination, it's the reasonable officer. Are you doing it for each officer individually? You do have to do it for each officer individually, and frankly, I haven't seen anything in this record that I would think would justify probable cause for any of them. I haven't. But I would say Weber is in a different position. But, you know, I think, Judge Gibbons, you would ask the question, are we really talking about, and I'm not saying this is you giving your opinion on what we're talking about, but your sort of observation, are we talking about a de minimis violation and trying to figure out how does qualified immunity kick in when you have a de minimis violation. And I guess what I would say to that is now we're talking about damages. We're talking about damages. And we're talking about getting my three clients who are going to be able to explain to a jury what does it look like in August of 2021 where one year removed from George Floyd. We understand what the climate in the United    people of color. Would it feel like for you?  all that would go to damages. Yeah. We got to  Exactly. But what I was really suggesting was that a part of the police case is implicitly an assumption that, you know, this wasn't to be the deal. Yeah, I know it is. That is part of their argument. Also, this happened very quickly and the officers needed to make decisions very quickly. I mean, that's the other side of that same coin. It is, but I don't know. It doesn't seem that quick to me. 15 minutes or so when you have a team of roughly six If we're just going to focus on Weber, it's two minutes. He realizes it's not the same guy. Sure, if we're just looking at that portion on the  but even that. I mean, Weber says he knows the moment they came out on the porch that it's not the same people. Does that make the probable cause go away? Does he know that other guy's not in the house? He knows there's three people. He's been called to the scene for a trespass. He knows there's three people coming out of the  He doesn't know who they are. Is he not entitled to secure the scene or is the problem that he secured the scene by himself? I'm not saying this is what you're doing,  but I'm saying any arguments to that end. We're just rationalizing Weber's conduct because so at that moment when he sees them on the porch and he takes them into custody, the caller didn't say I think there's three or more people. They said there's three people in the house and they said     it's afternoon. This is the middle of an afternoon when you would expect people who are going to be looking at a house to be looking at a house. So Weber has to know at that moment, wait a second, this is a misunderstanding. Let me at least turn and glance at the driveway and see, okay. I appreciate your time. We appreciate the argument both of you have given and we'll consider the matter carefully.